**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA,
SOUTHERN DIVISION**

| | |
|---|---|
| SE PROPERTY HOLDINGS, LLC, | * |
| Plaintiff, | * |
| v. | * |
| CADENCE BANK, BANK OF FRANKLIN and WEST ALABAMA BANK & TRUST, | * Case No: 1:25-CV-00185 |
| Defendants. | * |

## COMPLAINT

COMES NOW SE Property Holdings, LLC ("SEPH" or "Plaintiff"), and alleges as its Complaint against Defendants Cadence Bank ("Cadence"), Bank of Franklin ("BOF") and West Alabama Bank & Trust ("WAB") (each a "Defendant" and collectively the "Defendants"), as follows:

### Parties

1. SEPH is an Ohio limited liability company and is successor by merger to Vision Bank ("Vision"). SEPH has one member, which is Park National Corporation. Park National Corporation is an Ohio corporation with its principal place of business in Ohio.

2. Cadence is a Mississippi corporation with its principal place of business in Mississippi. Cadence transacts business within the State of Alabama.

3. BOF is a Mississippi corporation with its principal place of business in Mississippi. BOF transacts business within the State of Alabama.

1

4. WAB is an Alabama corporation with its principal place of business in Alabama. WAB transacts business within the State of Alabama.

## Jurisdiction

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00, exclusive of costs and interest, and there exists complete diversity of citizenship between Plaintiff and Defendants.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and the real property that is a subject of this action is situated in this district and the mortgage encumbering said real property that is a subject of this action is recorded in the public records of Baldwin County, Alabama within this district.

7. The Plaintiff and Defendants also agreed that this judicial district is a proper venue in the Participation Agreements (defined below).

## Allegations

8. On or about March 24, 2005, Vision made a fully advanced/funded $6,000,000 loan (the "West Loan") to Bama Bayou, LLC, f/k/a Riverwalk, LLC ("Bama Bayou"). The West Loan was secured by a first place mortgage (the "West Mortgage") on approximately 41 acres of land located in Baldwin County, Alabama (the "West Parcel").

9. Security Bank of Bibb County ("Security Bank") acquired a 50% participation interest in the West Loan, BOF acquired a 25% participation interest in the West Loan, and WAB acquired a 16.67% participation interest in the West Loan. Vision retained an 8.33% interest in the West Loan.

10. Security Bank subsequently failed as a financial institution and its assets and operations were acquired and/or taken over by the Federal Deposit Insurance Corporation ("FDIC"). The FDIC subsequently sold and assigned Security Bank's 50% participation interest in the West Loan to State Bank and Trust Company ("State Bank") in 2009. Effective January 1, 2019 State Bank merged with and into Cadence, so that Cadence acquired said 50% participation interest.

11. Cadence, BOF and WAB (each a "Participant") acquired and/or hold their respective participation interests in the West Loan pursuant to separate Participation Agreements (each a "Participation Agreement") between such Participant, as the participating bank, and Vision, as the originating bank. Having acquired Security Bank's 50% interest in the West Loan, Cadence has succeeded to Security Bank's rights and obligations under the Participation Agreement between Security Bank and Vision. SEPH is the successor in interest to Vision under each Participation Agreement. Pursuant to the Participation Agreements, the West Loan is now owned by Cadence (50%), BOF (25%) and WAB (16.67%), as the participating bank under their respective Participation Agreements, and SEPH (8.33%), as the originating bank under each Participation Agreement. The Participation Agreements govern the rights and obligations of the Participants and SEPH with respect to the West Loan. As the originating bank under the Participation Agreements, Vision (and now SEPH) was (and is) authorized and empowered to collect the West Loan for the Participants and SEPH.

12. Vision made a second fully advanced/funded loan to Bama Bayou in 2006 in the principal amount of $5,000,000 (the "East Loan") which was secured by a first place mortgage (the "East Mortgage") on approximately 87 acres of land located in Baldwin County, Alabama (the "East Parcel").

13. Vision made a third loan to Bama Bayou in 2007 in the maximum principal amount of $5,000,000 (the "North Loan"), but only $3,950,495 was advanced under the North Loan (the West Loan, East Loan and North Loan are sometimes referred to herein separately as a "Loan" and collectively as the "Loans"). The North Loan was secured (and is still secured) by a first place mortgage (the "North Mortgage") on approximately 7.6 acres of land located in Baldwin County, Alabama (the "North Parcel"). The North Mortgage also covered and encumbered the East Parcel as a second place mortgage behind the East Mortgage.

14. The Loans were guaranteed by over 20 individuals and entities (each a "Guarantor") pursuant to separate Limited Continuing Guaranties (each a "Guaranty") signed by each Guarantor. However, some Guarantors guaranteed the East Loan and/or North Loan but did not guarantee the West Loan (each a "Spouse Guarantor"), including Jennifer Lawler who guaranteed the North Loan only.

15. Bama Bayou defaulted on all three Loans and in December of 2008 Vision demanded that Bama Bayou and the Guarantors pay all three Loans in full. Bama Bayou and the Guarantors did not pay the Loans and in January of 2009 Vision filed suit against Bama Bayou and all Guarantors in the Circuit Court of Mobile County, Alabama, styled *Vision Bank v. Bama Bayou, LLC*, cv-2009-900085 (the "Collection Lawsuit"). Vision engaged the law firm McDowell Knight Roedder & Sledge LLC (the "McDowell Firm") and Southeast Property Solutions, LLC ("SPS") to collect the Loans, with the McDowell Firm being compensated on a (reduced) hourly rate basis and SPS being compensated on a (reduced) contingency fee basis.

16. In February of 2012, Vision merged with and into SEPH, resulting in SEPH being substituted for Vision in the Collection Lawsuit and SEPH succeeding to Vision's rights, interests and obligations in, to and under the Loans and the Participation Agreements.

17. The Collection Lawsuit was very contentious and multiple counterclaims were filed against Vision/SEPH by Bama Bayou and the Guarantors. Bama Bayou and the Guarantors also brought claims against the Participants. In addition, the FDIC acquired a participation interest in the East Loan through another financial institution that failed. The FDIC then intervened in the Collection Lawsuit and removed the case to federal court twice. Orders remanding the case to state court were entered both times but the FDIC appealed both rulings. These removals and appeals delayed the Collection Lawsuit for nearly four years. To get the Collection Lawsuit back on track (and as a demonstration of SEPH's diligent efforts to collect the Loans and good faith toward the Participants), SEPH purchased the FDIC's participation interest in the East Loan so the FDIC would no longer be a party to the Collection Lawsuit and so the second appeal would be dismissed and the case remanded to state court. This strategy worked and the Collection Lawsuit was remanded and moved forward.

18. SEPH eventually obtained judgment in its favor in the Collection Lawsuit on November 20, 2019 (i) against Bama Bayou in varying amounts for the West Loan, for the East Loan and for the North Loan ($20,245,143 in the aggregate for all 3 Loans), and (ii) against each Guarantor in varying amounts based on the amounts and Loans guaranteed by each respective Guarantor (collectively, the "First Judgment"). The Court in the Collection Lawsuit did not award SEPH all sums that SEPH claimed it was owed under the Loans and Guaranties (the "Additional Amounts"), and SEPH therefore appealed the portion of the First Judgment denying the Additional Amounts. That portion of the First Judgment (denying the Additional Amounts) was reversed by the Alabama Supreme Court, and after remand the Court in the Collection Lawsuit entered a second judgment on March 8, 2021 for the Additional Amounts (i) against Bama Bayou in varying amounts for the West Loan, for the East Loan and for the North Loan ($10,529,067 in the aggregate

for all 3 Loans), and (ii) against most of the Guarantors in varying amounts (collectively, the "Second Judgment", and together with the First Judgment, the "Judgments").

19. At the time of the entry of the First Judgment, SEPH owned 100% of the East Loan and North Loan, and the West Loan was owned 91.67% collectively by the Participants and 8.33% by SEPH. The Participation Agreements require each Participant to reimburse SEPH for that Participant's pro-rata share of "approved, commercially reasonable expenses" for the West Loan. The Participation Agreements define such expenses to include expenses that are a logical consequence of approved action taken by SEPH, including approved action in response to default under the loan documents. Since SEPH would be collecting the First Judgment (and Second Judgment when entered) for all three Loans, the Participants and SEPH entered into an Allocation and Disbursement Agreement on or about March 6, 2020 (the "Allocation Agreement") setting out (i) how collections by SEPH from Bama Bayou and the Guarantors would be allocated and disbursed among the three Loans, and (ii) to some degree, how collection costs incurred by SEPH would be allocated among the three Loans. Although the Participation Agreements required the Participants to reimburse SEPH for collection costs (upon demand by SEPH), as further evidence of SEPH's diligence and good faith to the Participants, SEPH "fronted" and paid all collection costs (without reimbursement from the Participants) until after the First Judgment was entered (viz., over 10 years).

20. The Allocation Agreement provides a general rule for collection allocations of 38.857% to the West Loan, 34.153% to the East Loan and 26.99% to the North Loan. However, due to the Spouse Guarantors (and their Guaranties of the East Loan and/or North Loan but not the West Loan) and the different collateral for each Loan, exceptions were made in the Allocation Agreement for collections/proceeds from (and collection costs relating to) the Spouse Guarantors

and the collateral securing the Loans, so that (i) collections from (and collection costs relating to) the Spouse Guarantors would be allocated to the East Loan and/or North Loan and not the West Loan, and (ii) proceeds from the foreclosure/sale of, and costs relating to, the (1) West Parcel would be allocated to West Loan, (2) East Parcel would be allocated to the East Loan, and (3) North Parcel would be allocated to the North Loan.

21.  Later in 2020, WAB and BOF requested that SEPH continue to front all attorney fees and other collection costs and (rather than be reimbursed by the Participants for their pro-rata share on a monthly basis or on demand by SEPH as required by the Participation Agreements) that SEPH be reimbursed through collections (at least until toward the end of the collection process). To accommodate WAB and BOF and as a further demonstration of SEPH's good faith to the Participants, SEPH agreed to do this and in October of 2020 WAB, BOF and SEPH entered into an amendment to the Allocation Agreement (the "Allocation Amendment"), wherein (i) SEPH, WAB and BOF agreed to the amount of collection costs incurred by SEPH through 2019 that was to be reimbursed to SEPH by WAB and BOF, and (ii) SEPH agreed to continue to front future collection costs and be reimbursed from collections. Cadence refused to sign the Allocation Amendment.

22.  As soon as the First Judgment was entered, SEPH immediately began recording the First Judgment in multiple states, counties, parishes and/or other jurisdictions to establish priority over other creditors, and as soon as allowed by law (30 days after entry of the First Judgment), SEPH began aggressively collecting the First Judgment from the Guarantors. This resulted in SEPH collecting $6,000,000 in December of 2019 from certain Guarantors, which funds were allocated among the three Loans in accordance with the Allocation Agreement.

23. SEPH continued to aggressively pursue collection of the First Judgment (and when entered, the Second Judgment). Many of the Guarantors had previously transferred away assets and SEPH filed at least 6 separate fraudulent transfer lawsuits (the "FT Lawsuits") against those Guarantors (and family members and related entities of those Guarantors) to recover those transferred assets. In addition, 9 Guarantors filed bankruptcy (several in other states) and SEPH had to pursue its collection efforts in those bankruptcy proceedings. SEPH also incurred attorneys' fees and expenses in connection with the successful appeal of the First Judgment, resulting in the subsequent award of the Additional Amounts totaling over $10 million. All of these additional lawsuits and proceedings were also contentious and aggressively defended, and SEPH had to engage (and pay) other additional counsel both within and outside the State of Alabama to help with these proceedings and collection efforts.

24. SEPH has recovered over $21 million in cash and property from the Guarantors. SEPH also foreclosed the West Parcel and sold the West Parcel for $2,000,000, three times the West Parcel's appraised value. Lastly, SEPH foreclosed the East Mortgage and sold the East Parcel for an astonishing $12.4 million, far in excess of the East Parcel's appraised value. The sale of the East Parcel resulted in a complete satisfaction of the East Loan and, since the North Mortgage was a 2nd place lien on the East Parcel, the surplus proceeds over and above the balance of the East Loan were allocated and disbursed to the North Loan as required by Alabama law.

25. The Participants claim to have been wronged by SEPH because the East Loan has been satisfied[1] in full and the North Loan has a small balance compared to the balance of the West Loan. However, these allocations and payments were made in accordance with the Allocation

---

[1] Although the East Loan has been satisfied, the East Loan is still entitled to receive $375,683 of the sales proceeds from the sale of the Saint Farm described below. The North Loan is also entitled to receive a portion of said sales proceeds.

Agreement and applicable law. Furthermore, the full satisfaction of the East Loan (and substantial reduction of the North Loan) through the sale of the East Parcel greatly benefitted the West Loan and Participants. When the East Loan was satisfied (thereby reducing the East Loan's share of future collections to zero), the West Loan's share of subsequent collections was increased to approximately 60% (with the remaining approximately 40% allocated to the North Loan). In addition, once the (greatly reduced) balance of the North Loan is paid in full, the West Loan's share of subsequent collections will be increased to 100%, resulting in more payments on the West Loan. The Participants have and will materially benefit from SEPH's efforts to collect and recover on the East and North Loans.

26. To date, SEPH has distributed to the West Loan (net of collections) over $5.8 million, with more recoveries and disbursements to come. That is an outstanding result for a $6,000,000 loan from the Great Recession, especially since SEPH has fronted (and paid) all collection costs and waited for reimbursement through collections from Bama Bayou and the Guarantors. The Participants have not paid anything out of pocket toward 16 years of collection costs. SEPH has solely carried all those collection costs for those 16 years. The Participants should be grateful for all that SEPH has done. They are not. Disputes have arisen between SEPH and the Participants, resulting in the need for this lawsuit to resolve those disputes.

### Complaints By All Participants

27. All three Participants have voiced criticism and objected to, and there currently exists a dispute between SEPH and all three Participants regarding, (i) the allocations among the three Loans made by SEPH for collections from Guarantors Stephen Lawler and Jennifer Lawler, (ii) the North Mortgage and North Parcel, and (iii) the fees paid by SEPH to SPS for the collection services and work performed by SPS.

(i) <u>The Lawler Dispute</u>.

28. Guarantors Stephen Lawler and Jennifer Lawler were married and filed bankruptcy jointly. SEPH negotiated a settlement in the bankruptcy proceeding with the Lawlers whereby the Lawlers would collectively pay $3,000,000 in satisfaction of their liability and obligations under their Guaranties of the Loans. The Participants approved this settlement amount. Stephen Lawler guaranteed all three Loans, but Jennifer Lawler guaranteed only the North Loan. Anything paid by Jennifer Lawler was therefore required to be allocated solely to the North Loan pursuant to the Allocation Agreement (and her Guaranty). After the Lawlers and SEPH agreed to the amount of the settlement ($3,000,000), the Lawlers informed SEPH that Jennifer Lawler would pay the entire $3,000,000 and Stephen Lawler would pay nothing, apparently because Jennifer Lawler had more assets than Stephen Lawler, which was reflected on their bankruptcy schedules.

29. Despite the Lawlers' allocation of all $3,000,000 to Jennifer Lawler (which would not have benefited the West Loan), SEPH allocated the $3,000,000 among the Loans based on the compared values of the Lawlers' respective non-exempt assets as shown on their bankruptcy schedules. SEPH also revised the initial Lawler allocations pursuant to requests made by one or more of the Participants, ultimately resulting in an approximately 75% allocation of the $3,000,000 to Jennifer Lawler's Guaranty and the North Loan and approximately 25% to Stephen Lawler's Guaranties and among all three Loans. The ultimate allocation was $2,255,700 solely to the North Loan and $744,300 (collectively) to the North Loan, East Loan and West Loan, with the West Loan receiving an allocation of $289,212 of the $3,000,000 (38.857% of $744,300). SEPH was initially informed the revised Lawler allocations were acceptable to all the Participants and that the Participants wanted SEPH to distribute the funds collected, but Cadence subsequently communicated that it was still reviewing the Lawler allocations and refused to take a distribution.

One or more of the Participants (including Cadence) still refuse to agree to SEPH's allocation and want a reallocation of the Lawler payment. SEPH maintains the allocation of the Lawler collections was proper and fair. The Participants may also dispute allocations made by SEPH for other collections.

  (ii) <u>The North Mortgage Dispute</u>.

  30. The Allocation Agreement clearly provides the North Mortgage and North Parcel secure the North Loan (not the West Loan) and that the proceeds from the sale of the North Parcel are to be allocated to the North Loan (not the West Loan). The Participants have demanded that SEPH foreclose the North Mortgage not only to satisfy the North Loan (so that all subsequent collections will be allocated to the West Loan), but also that SEPH do certain things and effect certain transactions with the Participants in order to produce surplus proceeds from the sale of the North Parcel (over and above the balance of the North Loan) for allocation to the West Loan (the "Additional North Transactions"). The Participants further assert that SEPH has a duty to the Participants to foreclose the North Mortgage and sell the North Parcel and effect the Additional North Transactions. SEPH disputes it has such duty and contends that the Additional North Transactions are not required and in fact are improper. SEPH also should not foreclose the North Mortgage until the disputes set forth herein are adjudicated and resolved so the balance of the North Loan can be made certain. A dispute therefore exists between SEPH and the Participants as to whether SEPH must foreclose the North Mortgage and effect the Additional North Transactions.

  (iii) <u>The SPS Fees Dispute</u>.

  31. The Participants have also objected to the fees paid by SEPH to SPS for SPS's collection efforts (the "SPS Fees") and dispute that the West Loan and the Participants have to share the cost of the SPS Fees. The Participation Agreements require the Participants to reimburse

SEPH for all "approved, commercially reasonable" collection costs, and SEPH asserts this includes not only legal fees and collection costs paid to attorneys (such as the McDowell Firm) on an hourly rate basis, but also the contingency fees paid to SPS because those fees were approved by the Court and are a logical consequence of filing suit to collect the loans and guaranties. WAB and BOF do not appear to object to reimbursement of their share of the other (hourly rate) legal fees and collection costs (viz., all collection costs other than the SPS Fees), but due to prior statements and conduct it is possible WAB and BOF will change course and object to and/or dispute some of those other (non-SPS) collection costs. Cadence has asserted it is not responsible for at least some of said other (non-SPS) collection costs. At least some of said other (hourly rate) collection costs are therefore also in dispute.

32. In the Second Judgment, the Court in the Collection Lawsuit approved all collection costs paid by SEPH through the date of the First Judgment (November 20, 2019), and awarded those collection costs (the "Pre-Judgment Costs") and entered judgment against Bama Bayou and most of the Guarantors for same. Those approved Pre-Judgment Costs did not include any of the SPS Fees because the SPS Fees were based on contingency and were not to be paid unless and until SEPH collected money (or assets) from Bama Bayou or the Guarantors. No money (or assets) were recovered by SEPH, and no fees were paid to SPS, until after the First Judgment was entered.

33. In March of 2023, SEPH filed an application with the Court in the Collection Lawsuit for approval of all attorney fees and collection costs (including without limitation all SPS Fees) paid by SEPH from the date of the First Judgment (November 20, 2019) through July 29, 2022 (collectively, the "Post Judgment Costs"). All those Post Judgment Costs (including $2,846,898.74 in SPS Fees) were approved and awarded by the Court and judgment was entered against Bama Bayou for same on January 24, 2024. All such collection costs (including all SPS

Fees) are a logical consequence of approved actions of SEPH, were approved and awarded by the Court in the Collection Lawsuit, and are therefore "approved, commercially reasonable" collection costs under the Participation Agreements. Each Participant is required to reimburse SEPH for such Participant's pro-rata share of same pursuant to the Participation Agreements, the Allocation Agreement and (with respect to BOF and WAB) the Allocation Amendment.

34. In addition to said Post Judgment Costs that have been approved in the Collection Lawsuit, SEPH has incurred attorney fees and collection costs (including SPS Fees) since July 29, 2022, and will continue to do so. The Participants have objected to all SPS Fees, and such SPS Fees (and the Participants' obligation to reimburse SEPH for the Participants' share of same) are in dispute. One or more of the Participants (including Cadence) also dispute other collection costs.

**Separate Cadence Issues**

35. In addition to the above, Cadence has asserted other objections, complaints, claims and defenses to its obligation to reimburse SEPH for collection costs, including that SEPH waited until after the First Judgment to request that Cadence reimburse SEPH for Cadence's portion of the Pre-Judgment Costs. In 2020, Cadence claimed (and apparently still claims) that if SEPH had requested reimbursement earlier, Cadence could have recovered some or all of its share of those collection costs from the FDIC pursuant to its purchase and/or reimbursement agreement (or similar or other agreement) with the FDIC from Cadence's purchase (through its predecessor State Bank) of its 50% participation interest in the West Loan from the FDIC (collectively, the "FDIC Agreement"). As a result, Cadence refused to sign the Allocation Amendment and has asserted it does not owe reimbursement for some or all of its share of the Pre-Judgment Costs. SEPH disputes this assertion. The Participation Agreements do not require SEPH to demand reimbursement of collection costs at any particular time. SEPH was willing to front, pay and carry (and did front,

13

pay and carry) all Pre-Judgment Costs until the First Judgment was entered and SEPH had recovered sufficient funds from Guarantors for reimbursement. Cadence has no right to complain. Cadence knew the Pre-Judgment costs were being incurred, and it knew that it was responsible for its share of them pursuant to its Participation Agreement with SEPH. SEPH had no knowledge of the FDIC Agreement or terms thereof, and it was Cadence's obligation to inform SEPH of the FDIC Agreement and request a statement or invoice for Cadence's share of collection costs earlier. All this shows SEPH has acted in good faith and Cadence has acted in bad faith.

36. Cadence has (more recently) also claimed it is not responsible for its share of much of the non-SPS collection costs because SEPH did not distribute certain funds to Cadence within 48 hours after collection by SEPH, based on language in the Participation Agreement. The Participation Agreement clearly does not require SEPH to distribute funds collected _after_ a Borrower default within 48 hours, and this claim by Cadence is further evidence of Cadence's bad faith. Furthermore, all the Participants (including Cadence) have consented to and/or acquiesced in SEPH holding smaller amounts collected until sufficient funds were on hand to make a meaningful distribution.

37. In addition, as further demonstration of Cadence's bad faith, for two years Cadence refused to accept its share of disbursements for the West Loan, requiring SEPH to retain and escrow nearly $1,000,000 that should have been distributed to Cadence. This caused SEPH accounting and regulatory reporting issues, and SEPH requested numerous times that Cadence confirm its wire instructions so that SEPH could wire the funds to Cadence. Cadence refused. Eventually, SEPH informed Cadence that SEPH had waited long enough and was wiring the funds to Cadence pursuant to wire instructions given to SEPH much earlier. In December of 2023, SEPH wired said sums ($981,803.30) to Cadence.

## COUNT ONE
### (Interpleader)

38. SEPH incorporates and realleges the facts and matters set forth in the above paragraphs.

39. SEPH is currently holding the sum of $1,842,749.53 from collections which is to be allocated and disbursed to the West Loan, East Loan and/or North Loan, or used to reimburse SEPH for collection costs paid by SEPH, consisting of (i) the sum of $415,959.63 which has been allocated to the West Loan but has not been disbursed to the owners of the West Loan because the West Loan's share of SPS Fees (which SEPH has paid but for which SEPH has not been reimbursed) exceeds said sum of $415,959.63, and (ii) the sum of $1,426,789.90, being the net sales proceeds from the February 2025 sale of real property previously acquired by SEPH in a settlement with a Guarantor and commonly referred to as the Saint Farm (collectively, the "Disputed Funds").

40. Cadence and WAB (and perhaps BOF also) have demanded that SEPH distribute to them their portion of the SPS fees that have previously been withheld from distributions for the West Loan. SEPH has refused because said SPS fees were properly deducted and withheld. In addition, SEPH is due to receive more from the Saint Farm sales proceeds being interpleaded (viz., for the East Loan and North Loan) than the amount of the SPS fees previously withheld. The interpleaded funds are therefore sufficient to address any claims the Participants have to said previously withheld SPS fees.

41. SEPH and the Participants all claim they have an interest in and are entitled to portions of the Disputed Funds, and the amounts to be paid to SEPH and the Participants are in dispute. SEPH therefore files this interpleader action and seeks to deposit the Disputed Funds (and perhaps additional sums collected later by SEPH for the West Loan and/or North Loan) with the

15

Court.

WHEREFORE, SEPH hereby requests that the Court: (i) permit SEPH to deposit the Disputed Funds with the Court; (ii) order the parties to interplead their respective claims to the Disputed Funds; (iii) adjudge which parties are entitled to the Disputed Funds and in what amount; (iv) discharge SEPH from any liability related to the Disputed Funds or any part thereof; (v) restrain the Participants from commencing any action for recovery of the Disputed Funds or any part thereof; and (vi) award SEPH its costs and reasonable attorneys' fees in this matter.

## COUNT TWO
(Declaratory Judgment)

42. SEPH incorporates and realleges the facts and matters set forth in the above paragraphs.

43. An actual justiciable controversy exists between SEPH and the Participants regarding (i) the Lawler allocations and perhaps other allocations and disbursements for the Loans made by SEPH, (ii) the North Mortgage, North Parcel and the Additional North Transactions, and (iii) the SPS Fees (and other collection costs) and the portion thereof the Participants are required to reimburse SEPH.

44. SEPH therefore needs (and requests) that the Court enter an Order and Declaratory Judgment addressing and resolving said issues and disputes.

WHEREFORE, SEPH requests that the Court enter an Order and Declaratory Judgment determining, approving, ruling, decreeing and/or ordering (i) that the allocations of the Lawler payment by SEPH were reasonable, fair and proper and are binding on the Participants, (ii) that all other allocations and disbursements of collections (and collection costs) by SEPH were proper and approving all of same so that they are binding on the Participants, (iii) that SEPH has no duty or obligation to the Participants to foreclose the North Mortgage and/or to effect the Additional North

Transactions, (iv) that all collection costs incurred by SEPH (including all SPS fees) in connection with the Collection Lawsuit, collection of the Judgments, foreclosure and sale of the West Parcel and/or East Parcel and liquidation/sale of other property acquired by SEPH from the Guarantors are "approved, commercially reasonable" collection costs under the Participation Agreements and the Participants are obligated to reimburse SEPH for their pro-rata portions of same pursuant to the Participation Agreements, Allocation Agreement and (with respect to BOF and WAB) the Allocation Amendment, (v) that the Participants' respective portions of said unreimbursed collection costs are to be paid to SEPH from the West Loan's share of the funds interpleaded with the Court herewith, and (vi) award SEPH its costs and reasonable attorneys' fees in this matter. SEPH requests such further (or different) relief as the Court may deem proper.

## COUNT THREE
(Breach of Contract – All Defendants)

45.     SEPH incorporates and realleges the facts and matters set forth in the above paragraphs.

46.     The Participants have refused to reimburse SEPH for the SPS Fees, which is a breach of the Participation Agreements. Cadence has also breached the Participation Agreement and/or Allocation Agreement by (i) refusing to be responsible for its share of the hourly rate collection costs, and (ii) unreasonably delaying and withholding its consent to (and obstructing) the foreclosure of the West Mortgage and sale of the West Parcel. Cadence has through its said bad faith conduct (and in other ways) further breached said Participation Agreement and the Allocation Agreement. As a result of said breaches, SEPH has been damaged.

WHEREFORE, SEPH demands judgment against the Participants in an amount to be determined by the Court including interest, costs, and reasonable attorneys' fees.

## COUNT FOUR
(Specific Performance – All Defendants)

47. SEPH incorporates and realleges the facts and matters set forth in the above paragraphs.

48. The Participants have refused to reimburse SEPH for any portion of the SPS Fees, which is a breach of their Participation Agreements. Cadence has also breached its Participation Agreement and/or Allocation Agreement by refusing responsibility for its share of the hourly rate collection costs.

49. The Participation Agreements provide for the remedy of specific performance against the Participants to enforce SEPH's rights under the Participation Agreement.

WHEREFORE, SEPH requests that the Court enter a judgment ordering specific performance by the Participants of the Participation Agreements' requirement that the Participants remit to SEPH their proportionate share of all legal fees and other collection costs incurred by SEPH in connection with the Collection Lawsuit and collection of the Judgments, and SEPH further requests an award of interest, costs and reasonable attorneys' fees.

## COUNT FIVE
Unjust Enrichment – All Defendants

50. SEPH incorporates and realleges the facts and matters set forth in the above paragraphs.

51. The Participants contend that certain collection costs were not specifically "approved" and are not recoverable which is based on a flawed reading of the Participation Agreements and a failure to acknowledge the Mobile County Circuit Court's approval of these collection costs. The Participants knew that SEPH was incurring collection costs on the West Loan and that SEPH expected to receive reimbursement for those costs, but the Participants are

refusing to reimburse those costs, or some of them, without any proper basis.

53. Therefore, as an alternative claim for SEPH's recovery of said collection costs, in the event that the Participants are permitted to receive distributions for collections on the West Loan but are not required to pay their proportionate share of the associated collection costs, then the Participants have been unjustly enriched in the amount of the disputed collection costs.

WHEREFORE, SEPH demands judgment against the Participants based on unjust enrichment in the amount of all collection costs disputed by the Participants plus interest.

Respectfully submitted,

/s/ *W. Craig Hamilton*
W. CRAIG HAMILTON (HAMIW1893)
chamilton@mcdowellknight.com
BRIAN P. MCCARTHY (MCCAB7434)
bmccarthy@mcdowellknight.com
JAMES BLAIR NEWMAN, JR.  (NEWMJ8590)
bnewman@mcdowellknight.com
*Attorneys for SE Property Holdings, LLC*

OF COUNSEL:
**MCDOWELL KNIGHT ROEDDER & SLEDGE, LLC**
11 North Water St., Ste. 13290
Mobile, Alabama  36602
(251) 432-5300
(251) 432-5303 (fax)

Defendants to be served by certified mail as follows:

Cadence Bank
c/o Reg. Agent - CT Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

Bank of Franklin
c/o Bradley B. Jones, President and CEO
9 Main St. E
Meadville, MS 39653

West Alabama Bank & Trust
c/o Reg. Agent - Nancy J. Turner
509 1st Ave. W
Reform, AL 35481